UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Brian Lynn Guyer,                    :
                                     : CIV. No. 3:17-cv-00609
            Plaintiff,               :
                                     :(Judge Richard P. Conaboy)
            v.                       :
                                     :
Nancy A. Berryhill,[1]               :
Acting Commissioner                  :
of Social Security                   :
                                     :
                                     :
            Defendant,               :
                                     :
                                     :
                                     :
_____

**MEMORANDUM**

**I.Background**

      We consider here Plaintiff's appeal from an adverse decision
of the Social Security Administration ("SSA" or "Agency") on his
application for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). Plaintiff's application
alleged that he became disabled on January 1, 2012. His claim was
initially denied at the administrative level and, after being

_____

      [1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure which addresses the substitution of parties when a
public officer is replaced, Nancy A. Berryhill should be substituted for Acting Commissioner
Carolyn W. Colvin as the defendant in this suit. Fed. R. Civ. P. 25 (d).  No further action needs to be
taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act,
42 U.S.C. Section 405(g), which states that "[a]ny action instituted in accordance with this
subsection shall survive notwithstanding any change in the person occupying the office of
Commissioner of Social Security or any vacancy in such office."

granted a hearing before an administrative law judge ("ALJ"),
denied again by a written decision dated August 31, 2015. The
Appeals Council denied Plaintiff's request for review on February
8, 2017. The Appeals Council's action constituted a "final
decision" by the Agency and vests this Court with jurisdiction over
this matter pursuant to 42 U.S.C. § 405 (g) and 42 U.S.C. § 1383
(c)(3). The parties have briefed the issues (Docs. 15, 16, and 17)
and this case is ripe for disposition.

## II. Testimony Before the ALJ.

Plaintiff's hearing before the ALJ was conducted on February
23, 2015. Plaintiff was represented by Atty. Kelly Anne Perry. In
addition to Plaintiff's testimony, testimony was taken from Tim
Mahler, a vocational expert.

Plaintiff stated that he lived with his grandfather in
Huntingdon, Pennsylvania; that he was 29 years old on the date of
the hearing; that he had one child aged three years; that he
graduated from high school but had experienced difficulty with
math, reading and writing; and that he experiences difficulty
reading the newspaper. (R.52-54).

Plaintiff recounted his work history. He testified that he had
worked at Wal-Mart in 2008 and 2009 as a paint mixer. He testified
that he would simply type the number of the paint ordered by a

customer and the machine would do the rest. The Plaintiff recalled that in his job at Wal-Mart he lifted no more than ten pounds at any time. (R.54).

Plaintiff then stated that he had worked as an egg crater at Farmer's Pride in 2006 and 2007. His job there consisted of placing eggs in a crate and then placing the crate in an incubator. The job at Farmer's Pride did not require Plaintiff to lift more than fifteen pounds. (R. 54-555).

From 2003 to 2006 Plaintiff worked as a trash collector for Parks Garbage Service. On that job Plaintiff had to lift up to fifty pounds at times. When very heavy objects were encountered plaintiff would lift them with the assistance of a co-worker. (R.55).

Plaintiff stated that he stopped working at Wal-Mart in 2009 because he "started getting pain and stuff in my back." He stated further that he no longer supports himself and that he receives food stamps and health insurance through "the assistance office". He testified also that he had a driver's license and that he drove 45 minutes to arrive at the hearing. (R.55-56).

Plaintiff sees family doctors at Broad Top Medical including Dr. Noah Schmuckler. He has seen Dr. Schmuckler "a lot" in the month preceding the hearing. Dr. Schmuckler was treating him for

pneumonia and he was also seeing a Dr. Silvis in Hershey regarding a possible hip surgery. (R. 56-58).

Plaintiff stated that he could walk about one block on a level surface before he would need to stop and rest. His hip would start "going out" at that point. He has fallen against walls several times because of his hip problem. He takes Percocet for his pain as needed and typically needs Percocet "every couple of days." He estimates that he can comfortably lift and carry about 20 pounds. If he lifted more than 20 pounds he would experience back and hip pain. He also estimates that he can sit for approximately 45 minutes before he would need to change positions and get up to move around. He also estimates that he is capable of standing in one position on a level surface for about 45 minutes. After 45 minutes he would need to "sit down and relax." (R. 58-6c).

Asthma has been a persistent problem for the Plaintiff. He takes asthma medication daily. He does not have a nebulizer at home and has not seen a respiratory specialist. He is scheduled to have an MRI on his hip and has also been diagnosed with attention deficit hyperactive disorder ("ADHD"). He takes 20 milligrams of Paroxetine daily to help control his ADHD but still experiences restlessness and anxiety. He takes unspecified medications prescribed by his family doctor for anxiety and depression. They

help keep him "calmed down". He denies side effects from these medications. His biggest problem, by his own estimation, is his hip problem. The hip problem is the biggest obstacle to his ability to maintain full-time employment. (R. 60-62).

Plaintiff's daily regimen does not consist of much physical activity. He runs the sweeper every few days, sometimes does grocery shopping to an unspecified extent, and does none of the cooking in his abode.

He sometimes visits and socializes with family and friends to "talk and stuff." He plays no sports and does not use video games. He last went to a restaurant about a month earlier. He stated that he does experience difficulty being out in public if a lot of people are around him. Being in that type of environment affects him badly. (R. 62-64).

Upon questioning by his attorney, Plaintiff revealed that he has a weak heart muscle and had been prescribed unspecified medications for that problem. He experiences "bad" chest pains on a daily basis. When these pains come on he will lie down, take his medicine, and try to forget about it. Walking makes his chest pains worse. He also related that he has an enlarged liver and reiterated his anxiety problem when in large groups of people. He takes a medication to help him relax and fall asleep. He typically gets

about 5 hours of sleep each night. He is frequently tired during the day and every 3 days or so it will "catch up" to him. Approximately 3 times each day he must lie down and try to relax for 45 minutes to combat his chest and hip pain. He does not believe that he can get through an entire workday without lying down. He thinks that even if he was able to sit or stand at a job as needed he would not be able to perform that job unless he was allowed to periodically lie down. (R. 64-67).

Also testifying was Tim Mahler, a vocational expert whose expertise was stipulated to by Plaintiff's counsel. Mr. Mahler indicated that he had reviewed Plaintiff's work history and was familiar with his past relevant work as a paint mixer, an egg crater, and a garbage collector. Mr. Mahler stated that the paint mixer position was "light, semiskilled" work; the egg crater position was "light, unskilled" work; and the garbage collector position was "very heavy, unskilled" work.

Mr. Mahler was asked to respond to a hypothetical question from the ALJ that asked him to assume a person of the same age, educational level, and work background as the Plaintiff who was able to: lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk 6 hours of an 8 hour work day with up to 6 hours of seated work with occasional left lower extremity pedal

operation; occasionally bend, balance, stoop, kneel, crouch and crawl; and no exposure to ladders, ropes, scaffolds, extreme cold or humidity, pulmonary irritants, unprotected heights, or dangerous machinery. The hypothetical question also limited work to simple, routine tasks that would not involve fast-paced quotas or more than occasional interaction with the public, coworkers, or supervisors. Mr. Mahler stated that, based upon the criteria in the hypothetical question, the only job the Plaintiff had ever held within those criteria was the egg crater position. Mr. Mahler indicated that other jobs in the national economy within the limitations imposed by the hypothetical question existed, including laundry folder, sorters, and inspector/checkers. Each of these jobs also fall within the classification of "light, unskilled".

Mr. Mahler also testified that, in order to retain any full time employment, a worker needs to be productive or "on task" at least 90% of the time not allocated to scheduled work breaks. Mr. Mahler stated unequivocally that being on task less than 90% of the time or habitually missing work more than one day per month would result in termination of employment. Mr. Mahler also stated that his opinions were consistent with the Dictionary of Occupational Titles and its supplements.

## III. Medical Evidence

### A. Dr. Noah Schmuckler

Dr. Schmuckler was Plaintiff's family physician from May of 2013 through at least February of 2015. In January of 2015 Dr. Schmuckler executed both a Mental Capacity Assessment and a Residual Functional Capacity Questionnaire regarding the Plaintiff. Dr. Schmuckler's Mental Capacity Assessment indicated that Plaintiff had "slight" limitations in: the ability to remember locations and work procedures; the ability to remember and understand very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customer tolerances; the ability to sustain an ordinary routine without special supervision; and the ability to ask simple questions or request assistance.[2] Plaintiff had "moderate" limitations in: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to make simple work related decisions; the ability to interact appropriately with the general public; the ability to accept instructions and respond

---

[2] "Slight" impairment in the context of the Mental Capacity Assessment means: "There is some mild limitation in this area but the individual can generally function satisfactorily."

appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set goals or make plans independently of others.[3] Plaintiff had "marked" limitations in: the ability to work in coordination with or in proximity to others without being distracted by them; the ability to complete a normal workday without interruptions from psychologically based symptoms; and the ability to perform any consistent pace with a standard number of rest periods.[4] Plaintiff had "extreme" limitations with respect to the ability to complete a normal work week without interruptions from psychologically based symptoms.[5] Dr. Schmuckler also indicated that Plaintiff had no limitation in his ability to: carry out short and simple instructions; get along with coworkers without exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness.

---

[3] "Moderate" impairment in the context of the Mental Capacity Assessment means: "The individual will have intermittent difficulty performing in this area. The individual can generally perform satisfactorily in this area but not always."

[4] "Marked" impairment in the context of the Mental Capacity Assessment means: "There is serious limitation in his area. The individual cannot generally perform satisfactorily in this area."

[5] "Extreme" limitations in the context of the Mental Capacity Assessment means: "There is major limitation in this area. There is no useful ability to function in this area."

Dr. Schmuckler also found, based on his interviews of the Plaintiff and his reported work history, that he would likely miss 4 or more days of work each month. Finally, Dr. Schmuckler noted that Plaintiff could manage benefits in his best interest and had experienced no difficulty with impulse buying or managing his finances. (R. at 931-934).

Dr. Schmucker also addressed Plaintiff's physical limitations in a Residual Functional Capacity Questionnaire. In that document he indicated (on January 9, 2015) that he had been Plaintiff's family physician for approximately one year and that he had diagnosed Plaintiff with left hip pain due to a congenital deformity, heart disease, and asthma/COPD. His prognosis was "life long impairment". He identified Plaintiff's systems as hip pain, shortness of breath, dizziness, and fatigue upon minimal exertion.
Dr. Schmuckler indicated also that Plaintiff's symptoms would "constantly" be severe enough to interfere with the concentration necessary to perform simple work-related tasks. Dr. Schmuckler stated that side effects from Plaintiff's medications included sedation and nausea and that these side effects would impact his capacity to work.

Dr. Schmuckler indicated further that Plaintiff would need to recline or lie down for some unspecified time beyond normal work

breaks each day. Dr. Schmuckler also estimated that Plaintiff: can walk less than one city block without needing to rest; can sit for no more than 5 minutes at a time and for a total of no more than one hour in an 8 hour work day; can stand or walk for no more than 15 minutes at a time and no more than 3 hours in an 8 hour workday; would require a sit/stand option in order to work; would require a 30 minute break every 5 to 15 minutes; can occasionally lift up to 50 pounds; has no limitation with respect to grasping or twisting objects or with fine manipulation but has no ability to repeatedly reach with his arms; is not a malinger but, nonetheless, could be expected to miss work more than 4 times each month; and was physically incapable of maintaining any full time employment on a sustained basis. (R. at 935-36)

### B. Dr. Andrew Cole

Dr. Andrew Cole is a Doctor of Psychology who saw Plaintiff for a consultative examination on June 9, 2015. Dr. Cole noted that Plaintiff had driven unaccompanied to his appointment a distance of some 51 miles. Plaintiff reported periods of depression, social withdrawal, and uneasiness in large groups. Dr. Cole described Plaintiff's demeanor as cooperative and assessed that he related adequately. Dr. Cole also assessed Plaintiff as well groomed with normal posture, motor behavior, and eye contact. Plaintiff's speech

11

was fluent and clear but his receptive language skills appeared under-developed for his age. His thought processes were coherent and goal directed and his mood was euthymic.

Dr. Cole stated that Plaintiff's attention and concentration were "mildly to moderately impaired due to limited intellectual functioning." Plaintiff's recent and remote memory skills were regarded to be in the "deficient range" and his fund of information was "somewhat limited". His insight and judgment were both assessed as "fair". Plaintiff appeared relax and comfortable during the evaluation and his attention and concentration were "adequate". Dr. Cole administered the WAIS-IV Test and determined that Plaintiff's full scale IQ was 65, a score in the extremely low range. Dr. Cole's diagnoses were: mild intellectual disability; unspecified depressive disorder; and unspecified anxiety disorder.

Dr. Cole completed a Medical Source Statement regarding Plaintiff's mental capacity. He assessed that Plaintiff had: "mild impairment" in his ability to understand simple instructions; his ability to carry out simple instructions; and the ability to make judgment on simple work-related decisions; had "moderate" impairment in his ability to interact appropriately with supervisors and co-workers; and had "marked" impairment in his ability to interact with the general public and in responding

appropriately to changes in a routine work setting. (R. at 985-992).

### C. Dr. Jennifer Hartley

Dr. Jennifer Hartley, Doctor of Psychology, saw Plaintiff on referral from the SSA on November 10, 2011. After taking a history from Plaintiff, Dr. Hartley observed the Plaintiff was well groomed and had appeared for his appointment in weather appropriate clothing. She found him to be alert and fully oriented and found that he was a good historian in relating his personal background. She experienced no difficulty communicating with Plaintiff and assessed his basic attention to be "intact". Dr. Hartley found Plaintiff's concentration to be "inefficient" and that his cognitive functioning was "below average". Plaintiff maintained good eye contact, responded to questions with "adequate comprehension", and displayed euthymic affect. He was "generally pleasant and cooperative throughout the interview."

On the basis of her one encounter with Plaintiff, Dr. Hartley diagnosed Plaintiff with learning disorder not otherwise specified, borderline intellectual functioning, and serious learning difficulties. She assigned a Global Assessment of Function Score of 52. (R. at 474-76).

**IV.    ALJ Decision**

The ALJ's decision (Doc. 14-2 at 22-38) was unfavorable to the Plaintiff. It included the following Findings of Fact and Conclusions of Law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

2. The claimant has not engaged in substantial gainful activity since January 1, 2012, the alleged onset date.

3. The claimant has the following severe impairments: borderline intellectual functioning, learning disorder, attention deficit hyperactivity disorder, left hip congenital abnormality, sacroiliac joint dysfunction, heart disease unspecified, mild intellectual disability, unspecified depression and anxiety, choleocystitis, solitary bone cyst of the left iliac wing, and hearing loss.

4. The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed

impairments.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except that the claimant is limited to occasional left lower extremity pedal control; occasional bending, balancing, stooping, kneeling, crouching, and crawling; occasional ramps and stairs; and no ladders, ropes, and scaffolds. The claimant is also limited to no exposure to extreme cold, humidity, and wetness; no exposure to noise above street level; no exposure to pulmonary irritants such as fumes, odors, dusts, and gases; and no exposure to hazardous conditions such as unprotected heights, dangerous machinery, and uneven surfaces. The claimant is further restricted to simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes and no work at production rate pace, fast-paced, quota type work. The claimant also requires occasional interaction with the public,

supervisors, and coworkers.

6. The claimant is capable of performing his past
   relevant work as an egg crater. This work does not
   require the performance of work-related activities
   precluded by the claimant's residual functional
   capacity.

7. The claimant has not been under a disability, as
   defined in the Social Security Act, from January
   1, 2012 through the date of this decision.

## V.    Disability Determination Process.

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[6] It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a

---

[6] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.30-36).

**VI. Standard of Review**

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.")

(footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham. 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence

included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir.

2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d

112 (3d Cir. 2000) ("[O]ur primary concern has always been the

ability to conduct meaningful judicial review."). An ALJ's

decision can only be reviewed by a court based on the evidence that

was before the ALJ at the time he or she made his or her decision.

*Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII.                    Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the

substantial evidence standard regarding the matters at issue here,

we note the Third Circuit has repeatedly emphasized the special

nature of proceedings for disability benefits. *See Dobrowolsky*,

606 F.2d at 406. Social Security proceedings are not strictly

adversarial, but rather the Social Security Administration provides

an applicant with assistance to prove his claim. *Id.* "These

proceedings are extremely important to the claimants, who are in

real need in most instances and who claim not charity but that

which is rightfully due as provided for in Chapter 7, Subchapter

II, of the Social Security Act." *Hess v. Secretary of Health,*

*Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such,

the agency must take extra care in developing an administrative

record and in explicitly weighing all evidence. *Dobrowolsky*, 606

F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B. Plaintiff's Allegations of Error.**

**1. Whether the ALJ erred in concluding that Plaintiff did not meet the criteria of Listing 12.05C?**

A claimant may prove disability at Step Three of the administrative process if he shows that he meets all the criteria of an Agency Listing. An impairment that meets only some of the criteria of a listed impairment, "no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521,530 (1990). It is the claimant's burden to present sufficient evidence indicating that an impairment or combination of impairments meets or equals a listed impairment. Id; see also 20 C.F.R. § 416.926. The ALJ need not use "magic words" in analyzing whether a claimant meets a listing, as long as his discussion of the evidence provides for "meaningful judicial review." Jones v. Barnhart, 364 F3rd 501, 505 (3rd Cir. 2004).

Listing 12.05C states as follows:

12.05 Mental retardation refers to significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age twenty-two.

The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.

…

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

The case law of our Circuit holds that " … to meet or equal listing 12.05, a claimant must prove that she experiences 'deficits' in adaptive functioning" with an onset prior to age 22 …." She must also show that she meets the requirements listed in one of subsections A, B, C, or D of that section."[7] Gist v. Barnhart, 67 Fed. Appx. 78 (3rd

_____

[7] We considered here only the requirements of subsection C because Plaintiff's allegation of error concerns only subsection C.

23

Circuit 2003); see also Demacio v. the Commissioner of Social Security, 2014 WL 1278086 at *12 (W. D. Pa.).

Because it is very clear to this Court that Plaintiff meets two of the criteria under listing 12.05 C (2 IQ scores between 60 and 70 and physical and mental impairments that impose additional and sufficient work-related limitations of function), this case pivots solely on whether there is substantial evidence to support the ALJ's conclusion that "the record does not establish deficits in adaptive functioning." (R. at 30). Due to the fact that the ALJ does not advise what standard he is using to measure "adaptive functioning", the Court lacks the ability to meaningful review this issue.

In 2002, the Social Security Administration published commentary indicating that it had purposely left open the question of what constituted an adaptive deficit. See Technical Revisions to Medical Criteria for Determination of Disability, 67 Federal Register 20018-01(April 24, 2002). The SSA acknowledged in that publication that, while the four leading professional mental health organizations employed disparate definitions of "intellectual disability" due to different standards for measuring "significant deficits in intellectual functioning", the SSA declined to

adopt "the methodology of one professional organization over another" and instead allowed for "the use of any measurement method recognized and endorsed by the professional organizations." Id.

In this case, the ALJ concluded that the record did not establish that Plaintiff had the requisite deficits in adaptive functioning without announcing which of these standards he was employing. If this Court is to meaningfully evaluate whether that is so, it was necessary for the ALJ to tell us what standard he used. See Demacio v. Commissioner, supra at *13; Lansdowne v. Astrue, 2012 WL 4069363 at *5 (W.D.Pa. September 17, 2012); and Fitts v. Commissioner of Social Security, (M.D. Pa. No. 4:15-cv-631 at Doc. 17, February 29, 2016, Mehalchick, M.J.).[8] In his terse, one paragraph discussion of this point (Doc. 14-2 at 6) the ALJ refers to none of the standards developed by the four leading mental health associations nor does he even attempt to articulate a composite standard of some sort. Beyond that, he flatly misstates that "the claimant does not have a valid verbal,

---

[8] We have read the Agency's brief and are aware of at least one district court case in our Circuit, Harper v. Colvin, 2014 WL 1478094 ( W. D. Pa.) and a Seventh Circuit case, Novy v. Astrue, 497 F.3rd 708 (2007), that find otherwise. While those opinions are entitled to our consideration and respect, this Court believes that the fundamental remedial purpose of the Social Security Act is better protected by requiring an ALJ to declare exactly what standard he employs when determining the extent of a claimant's "adaptive deficits". This Court will continue to apply this standard unless and until the Third Circuit Court of Appeals directs us to the contrary.

performance or full scale IQ of 60 to 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. In fact, the record includes two full scale IQ tests evaluating the claimant's IQ at 64 (long before he attained the critical age of 22) and 65 (as an adult). The ALJ has also identified numerous other "severe impairments" (R. at 27) that were significant enough to impose additional limitations on the Plaintiff's ability to do "light work" in the residual functional capacity the ALJ determined for the Plaintiff. (R. at 30). Inaccuracies of this type coupled with the ALJ's failure to articulate the standard by which he assessed Plaintiff's deficits prevent this Court from concluding that the Agency's decision is supported by the requisite substantial evidence. Accordingly, the Plaintiff's assignment of error on this point is approved and this case will be remanded for further proceedings wherein the Agency: (1) more specifically discusses the third prong under Listing 12.05 by specifically defining "deficits in adaptive functioning," either with reference to one of the standards endorsed by the leading mental health organizations such as the American Psychiatric Association or American Association on Intellectual and Developmental Disabilities or a definition which is consistent with the

definitions employed by those organizations; and (2) addresses why Plaintiff had no deficits in adaptive functioning for purposes of 12.05 in light of the functional limitation findings which appeared later in the ALJ's decision.

**2. Whether substantial evidence supports the vocational expert's testimony that work within Plaintiff's capacities exists in the national economy?**

Plaintiff asserts that conflicts between the VE's description of jobs he identified as within Plaintiff's capacities and the description of those jobs in the Dictionary of Occupational Titles require a remand of this case. These alleged conflicts concern the amount of time spent standing and walking while performing jobs classified by the SSA as "light work".

While it is true that "light work" entails, by definition, standing and walking for up to six hours of an eight hour work day, the VE testified that, based on his 36 years of experience in the field, the jobs he identified were "light" in nature and actually required no more than 4 hours of walking and standing as actually performed. (R. at 75). The Court views this explanation as an adequate reconciliation of the VE's testimony vis-a-vis the literal text of the DOT. Accordingly, Plaintiff's assignment of error on this point will be rejected.

**VIII. Conclusion.**

For the reasons addressed above, this case will be remanded to the Commissioner for further proceedings to clarify: (1) what standard was used to assess Plaintiff's "deficits in adaptive functioning" in the context of Listing 12.05; and (2) whether these deficits manifested before Plaintiff reached the age of 22. An Order consistent with the foregoing will be issued contemporaneously.

**By the Court**

S/Richard P. Conaboy
**RICHARD P. CONABOY**
**United States District Judge**

**DATED: November 13, 2017**